# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID ROBERT HASELTINE, NATALIE CASETELLANOS FLORES, DANIEL WALLACE, JEFFREY ELLISON, DANIEL KRAUSER, AMELIO OSORIO, MICKEY HWANG, RONNIE MORROW, SR., EVELYN MALONE, DEBORAH REYNOLDS, and DAN WHATLEY, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>FINANCIAL BUSINESS AND CONSUMER SOLUTIONS, INC.,<br><br>        Defendant. | Case No. 2:24-cv-01876-NIQA<br><br>**CONSOLIDATED CLASS ACTON COMPLAINT**<br><br><br>CLASS ACTION<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs David Robert Haseltine, Natalie Castellanos Flores, Daniel Wallace, Jeffrey Ellison, Daniel Krauser, Amelio Osorio, Mickey Hwang, Ronnie Morrow, Sr., Evelyn Malone, Deborah Reynolds, and Dan Whatley ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through the undersigned attorneys, bring this class action against Defendant Financial Business and Consumer Solutions, Inc. ("FBCS" or "Defendant"), and complain and allege upon personal knowledge and information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiffs bring this class action against FBCS for its failure to secure and safeguard their and approximately 4,253,394 other individuals' personally identifiable information, including names, Social Security numbers ("SSN"), dates of birth, and account information (collectively, "PII").

2.      FBCS is a Pennsylvania-based debt collection agency that provides accounts receivable management and collection services across a variety of industries.[1]

3.      FBCS reported that, on or about February 26, 2024, it "discovered unauthorized access to certain systems in its network" and subsequently "launched an investigation." Defendant's investigation revealed that its network "was subject to unauthorized access between February 14 and February 26, 2024, and the unauthorized actor had the ability to view or acquire certain information on the FBCS network during the period of access" (the "Data Breach").[2]

4.      FBCS provided limited details about the Data Breach, including whether the cybercriminal(s) responsible for the Data Breach were identified or whether the information exfiltrated was held for ransom. FBCS also did not disclose whether its investigation detected the compromised information on the dark web. Instead, FBCS stated that it "immediately took steps to conduct a diligent investigation to confirm the nature and scope of the incident" and "implemented additional safeguards in a newly built environment."[3] FBCS also offered access to credit monitoring and identity restoration services through CyEx at no charge to affected individuals but, as Plaintiffs' allegations will make clear, this offer is woefully inadequate.

5.      Despite learning of the Data Breach as early as February 26, 2024, FBCS did not announce the Data Breach publicly until April 26, 2024, and did not begin sending out breach notification letters to affected individuals until around that time. According to Defendant's notice (the "Notice"), the information compromised in the Data Breach included names, SSNs, dates of birth, and account information.[4]

---

[1] https://www.fbcs-inc.com/about-fbcs-collection-agency/ (last visited Aug. 16, 2024).
[2] Notice of Data Event, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/7e6ff931-a035-480f-a977-e11a8af7f768.html (last visited Aug. 16, 2024).
[3] *Id.*
[4] *Id.*

6.      Defendant's Notice did not disclose how it discovered the encrypted files on its computer systems were impacted, the means and mechanism of the cyberattack, the reason for the delay in notifying Plaintiffs and Class Members of the Data Breach, how it determined that the PII had been "accessed or exfiltrated" during the Data Breach, and, importantly, what specific steps FBCS took following the Data Breach to secure its systems and prevent future cyberattacks.

7.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII from the foreseeable threat of a cyberattack.

8.      By being entrusted with Plaintiffs' and Class Members' PII for its own pecuniary benefit, Defendant assumed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiffs' and Class Members' PII against unauthorized access and disclosure. Defendant also had a duty to adequately safeguard this PII under applicable law, as well as pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act"). Defendant breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII in its possession from unauthorized access and disclosure.

9.      As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs and approximately 4,253,394 Class Members suffered injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from the exposure, and the present and imminent threat of fraud and identity theft. This action seeks to remedy these failings and their consequences.

10.    Defendant's failure to timely notify the victims of its Data Breach meant that Plaintiffs and Class Members were unable to immediately take affirmative measures to prevent or mitigate the resulting harm.

11.    Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiffs' and Class Members' sensitive and confidential PII remains in the possession of Defendant. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

12.    Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to adequately train its staff and employees on proper security measures; and failing to provide Plaintiffs and Class Members with prompt and adequate notice of the Data Breach.

13.    In addition, Defendant failed to properly monitor the computer network and systems that housed the PII. Had Defendant properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

14.    The security of Plaintiffs' and Class Members' identities is now at risk because of Defendant's wrongful conduct, as the PII that Defendant collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

15.    Armed with the PII accessed in the Data Breach, data thieves can commit a wide range of crimes including, for example, opening new financial accounts in Plaintiffs' and Class Members' names, taking out loans in their names, using their identities to obtain government

benefits, filing fraudulent tax returns using their information, obtaining driver's license numbers in Plaintiffs' and Class Members' names, and giving false information to police during an arrest.

16.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a present and imminent risk of fraud and identity theft. Among other measures, Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft. Further, Plaintiffs and Class Members will incur out-of-pocket costs to purchase adequate credit monitoring and identity theft protection and insurance services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17.     Plaintiffs and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. Moreover, because the exposed information includes SSNs and other immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

18.     Plaintiffs and Class Members seek to hold Defendant responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiffs seek to remedy the harms resulting from the Data Breach on behalf of themselves and all similarly situated individuals whose PII was accessed and exfiltrated during the Data Breach.

19.     Plaintiffs, individually and on behalf of all other Class Members, bring claims for negligence/negligence per se, breaches of third-party contracts to which Plaintiffs and Class Members are and were beneficiaries, declaratory and injunctive relief, violations of state consumer protection and privacy laws, and unjust enrichment. To remedy these violations of law, Plaintiffs and Class Members seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to Defendant's data security protocols and

employee training practices); reasonable attorneys' fees, costs, and expenses incurred in bringing this action; and all other remedies the Court deems just and proper.

## PARTIES

### Plaintiffs

#### *Plaintiff David Robert Haseltine*

20.     Plaintiff David Robert Haseltine is a resident and citizen of San Francisco, California. Plaintiff Haseltine's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

21.     Plaintiff Haseltine currently does not have knowledge of how FBCS obtained his PII. Plaintiff does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff did not provide his PII to FBCS.

22.     Plaintiff Haseltine is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Haseltine has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Haseltine stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

23.     At the time of the Data Breach, FBCS retained Plaintiff Haseltine's PII in its systems, and on information and belief continues to retain that information.

24.     Plaintiff Haseltine first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Haseltine made reasonable efforts to mitigate its impact, including, but not limited to, monitoring his various financial and banking accounts, disputing unauthorized

charges, closing his affected banking account and moving his money to a new bank, changing his passwords, and utilizing credit monitoring services.

25.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Haseltine will need to maintain these heightened measures for years.

26.     In the time following the Data Breach, Plaintiff Haseltine has experienced unauthorized fraudulent charges, and unauthorized access of his financial accounts.

27.     Plaintiff Haseltine also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff's privacy rights as a result of unauthorized disclosure of his PII.

28.     Plaintiff Haseltine has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

29.     Plaintiff Haseltine has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

30.     Plaintiff Haseltine is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack, so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

31.     Plaintiff Haseltine has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Natalie Castellanos Flores

32.     Plaintiff Natalie Castellanos Flores is a resident and citizen of Oakland, California. Plaintiff's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

33.     Plaintiff Flores currently does not have knowledge of how FBCS obtained her PII. Plaintiff Flores does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Flores did not provide her PII to FBCS.

34.     Plaintiff Flores is careful about sharing her PII and takes reasonable steps to protect her PII. Plaintiff Flores has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Flores stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

35.     At the time of the Data Breach, FBCS retained Plaintiff Flores's PII in its systems, and on information and belief continues to retain that information.

36.     Plaintiff Flores first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying her of the Data Breach and that her PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Flores made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring her various financial and banking accounts, and reviewing/utilizing her credit monitoring services.

37.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Flores will need to maintain these heightened measures for years.

38.     In the time following the Data Breach, Plaintiff Flores has experienced a significant increase in spam emails, and was notified that her PII is available on the dark web.

39.     Plaintiff Flores also suffered actual injury from having her PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Flores' confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff Flores's privacy rights as a result of Defendant's unauthorized disclosure of PII.

40.     Plaintiff Flores has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed her PII to unauthorized parties who may now use that information for improper and unlawful purposes.

41.     Plaintiff Flores has suffered, and will continue to suffer for the remainder of her life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from her PII being obtained by unauthorized third parties and/or cybercriminals.

42.     Plaintiff Flores is also at a continued risk of harm because, on information and belief, her PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

43.     Plaintiff Flores has a continuing interest in ensuring that her PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Daniel Wallace

44.     Plaintiff Daniel Wallace is a resident and citizen of Long Beach, California. Plaintiff Wallace's PII was obtained by FBCS in connection with FBCS' provision of debt collection services to its clients.

45.     Plaintiff Wallace currently does not have knowledge of how FBCS obtained his PII. Plaintiff Wallace does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Wallace did not provide his PII to FBCS.

46.     Plaintiff Wallace is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Wallace has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Wallace stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

47.     At the time of the Data Breach, FBCS retained Plaintiff Wallace's PII in its systems.

48.     Plaintiff Wallace first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Wallace made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring his various financial and banking accounts, disputing unauthorized charges, and obtaining his credit reports.

49.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Wallace will need to maintain these heightened measures for years.

50.     In the time following the Data Breach, Plaintiff Wallace has experienced attempts to obtain loans in his name, unauthorized access or attempted access of his financial accounts, inquiries on his credit, and a significant increase in spam calls.

51.     Plaintiff Wallace also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Wallace's confidential PII—a form of property that was entrusted to FBCS, which was compromised as a result of the Data Breach it failed to prevent, and (b) a violation of Plaintiff Wallace's privacy rights as a result of FBCS's unauthorized disclosure of PII.

52.     Plaintiff Wallace has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for unknown purposes.

53.     Plaintiff Wallace has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

54.     Plaintiff Wallace is also at a continued risk of harm because, on information and belief, his PII remains in FBCS's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as FBCS fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

55.     Plaintiff Wallace has a continuing interest in ensuring that his PII, which remains within FBCS's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Jeffrey Ellison

56.     Plaintiff Jeffrey Ellison is a resident and citizen of Rome, Georgia. Plaintiff Ellison's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

57.     Plaintiff Ellison currently does not have knowledge of how FBCS obtained his PII. Plaintiff Ellison does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Ellison did not provide his PII to FBCS.

58.     Plaintiff Ellison is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Ellison has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Ellison stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

59.     At the time of the Data Breach, FBCS retained Plaintiff Ellison's PII in its systems, and on information and belief continues to retain that information.

60.     Plaintiff Ellison first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Ellison made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring his various financial and banking accounts, signing up for credit monitoring services, and researching the data breach.

61.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Ellison will need to maintain these heightened measures for years.

62.     In the time following the Data Breach, Plaintiff Ellison has experienced an exorbitant amount of spam calls and texts.

63.     Plaintiff Ellison also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Ellison's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff Ellison's privacy rights as a result of Defendant's unauthorized disclosure of PII.

64.     Plaintiff Ellison has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

65.     Plaintiff Ellison has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

66.     Plaintiff Ellison is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as FBCS fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

67.     Plaintiff Ellison has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Daniel Krauser

68.     Plaintiff Daniel Krauser is a resident and citizen of Woodstock, Illinois. Plaintiff Krauser's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

69.     Plaintiff Krauser currently does not have knowledge of how FBCS obtained his PII. Plaintiff Krauser does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Krauser did not provide his PII to FBCS.

70.     Plaintiff Krauser is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Krauser has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Krauser stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

71.     At the time of the Data Breach, FBCS retained Plaintiff Krauser's PII in its systems, and on information and belief continues to retain that information.

72.     Plaintiff Krauser first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Krauser made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring his various financial and banking accounts, disputing unauthorized charges, changing his passwords, utilizing credit monitoring services, and freezing his credit.

73.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Krauser will need to maintain these heightened measures for years.

74.     In the time following the Data Breach, Plaintiff Krauser has experienced unauthorized fraudulent charges, inquiries on his credit, a significant increase in spam emails, and was notified that his PII is available on the dark web.

75.     Plaintiff Krauser also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Krauser's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff Krauser's privacy rights as a result of Defendant's unauthorized disclosure of PII.

76.     Plaintiff Krauser has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

77.     Plaintiff Krauser has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

78.     Plaintiff Krauser is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

79.     Plaintiff Krauser has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Amelio Osorio

80.     Plaintiff Amelio Osorio is a resident and citizen of Lowell, Massachusetts. Plaintiff Osorio's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

81.     Plaintiff Osorio currently does not have knowledge of how FBCS obtained his PII. Plaintiff Osorio does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Osorio did not provide his PII to FBCS.

82.     Plaintiff Osorio is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Osorio has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Osorio stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

83.     At the time of the Data Breach, FBCS retained Plaintiff Osorio's PII in its systems, and on information and belief continues to retain that information.

84.     Plaintiff Osorio first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Osorio made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring his various financial and banking accounts and changing his passwords.

85.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Osorio will need to maintain these heightened measures for years.

86.     In the time following the Data Breach, Plaintiff Osorio has received an exorbitant amount of spam calls, emails, and texts.

87.     Plaintiff Osorio also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Osorio's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff's privacy rights as a result of Defendant's unauthorized disclosure of PII.

88.     Plaintiff Osorio has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

89.     Plaintiff Osorio has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

90.     Plaintiff Osorio is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

91.     Plaintiff Osorio has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

**_Plaintiff Mickey Hwang_**

92.     Plaintiff Mickey Hwang is a resident and citizen of Fort Lee, New Jersey. Plaintiff Hwang's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

93.     Plaintiff Hwang provided his PII to Merrick Bank in conjunction with obtaining a credit card. Plaintiff received a letter from FBCS in or around January 2023, informing him that FBCS was attempting to collect a debt on behalf of Merrick Bank. Plaintiff Hwang did not provide FBCS with his PII and believes Merrick Bank provided his PII to FBCS.

94.     Plaintiff Hwang is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Hwang has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Hwang stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

95.     At the time of the Data Breach, FBCS retained Plaintiff Hwang's PII in its systems, and on information and belief continues to retain that information.

96.     Plaintiff Hwang first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Hwang made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring his various financial and banking accounts, changing his passwords, and utilizing credit monitoring services.

97.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Hwang will need to maintain these heightened measures for years.

98.     In the time following the Data Breach, Plaintiff Hwang has experienced a significant increase in spam emails and text messages, and was notified that his PII is available on the dark web.

99.     Plaintiff Hwang also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff Hwang's privacy rights as a result of Defendant's unauthorized disclosure of PII.

100.    Plaintiff Hwang has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

101.    Plaintiff Hwang has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

102.    Plaintiff Hwang is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

103.    Plaintiff Hwang has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

**_Plaintiff Ronnie Morrow, Sr._**

104.    Plaintiff Ronnie Morrow, Sr. is a resident and citizen of Copiague, New York. Plaintiff Morrow's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

105.    Plaintiff Morrow currently does not have knowledge of how FBCS obtained his PII. Plaintiff Morrow does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Morrow did not provide his PII to FBCS.

106.    Plaintiff Morrow is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Morrow has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Morrow stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

107.    At the time of the Data Breach, FBCS retained Plaintiff Morrow's PII in its systems, and on information and belief continues to retain that information.

108.    Plaintiff Morrow first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Morrow made reasonable efforts to mitigate the impact thereof, including, but not limited to, checking his financial account statements thoroughly, researching the Data Breach, and checking his credit reports for accuracy.

109.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Morrow will need to maintain these heightened measures for years.

110.    In the time following the Data Breach, Plaintiff Morrow has experienced an increase in spam calls, texts, and emails.

111.    Plaintiff Morrow also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff's privacy rights as a result of Defendant's unauthorized disclosure of PII.

112.    Plaintiff Morrow has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

113.    Plaintiff Morrow has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

114.    Plaintiff Morrow is also at a continued risk of harm because his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

115.    Plaintiff Morrow has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Evelyn Malone

116.    Plaintiff Evelyn Malone is a resident and citizen of Liverpool, Ohio. Plaintiff Malone's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

117.    Plaintiff Malone currently does not have knowledge of how FBCS obtained her PII. Plaintiff Malone does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Malone did not provide her PII to FBCS.

118.    Plaintiff Malone is careful about sharing her PII and takes reasonable steps to protect her PII. Plaintiff Malone has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Malone stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

119.    At the time of the Data Breach, FBCS retained Plaintiff Malone's PII in its systems, and on information and belief continues to retain that information.

120.    Plaintiff Malone first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying her of the Data Breach and that her PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Malone made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring her various financial and banking accounts, disputing unauthorized charges and filing associated police reports, changing her passwords, and freezing her credit.

121.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Malone will need to maintain these heightened measures for years.

122.    In the time following the Data Breach, Plaintiff Malone has experienced unauthorized fraudulent charges, a significant increase in spam emails, and was notified that her PII is available on the dark web.

123.    Plaintiff Malone also suffered actual injury from having her PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Malone's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff Malone's privacy rights as a result of Defendant's unauthorized disclosure of PII.

124.    Plaintiff Malone has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed her PII to unauthorized parties who may now use that information for improper and unlawful purposes.

125.    Plaintiff Malone has suffered, and will continue to suffer for the remainder of her life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from her PII being obtained by unauthorized third parties and/or cybercriminals.

126.    Plaintiff Malone is also at a continued risk of harm because, on information and belief, her PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

127.     Plaintiff Malone has a continuing interest in ensuring that her PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### Plaintiff Deborah Reynolds

128.     Plaintiff Deborah Reynolds is a resident and citizen of Hallam, Pennsylvania. Plaintiff Reynolds' PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

129.     Plaintiff Reynolds currently does not have knowledge of how FBCS obtained her PII. Plaintiff Reynolds does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Reynolds did not provide her PII to FBCS.

130.     Plaintiff Reynolds is careful about sharing her PII and takes reasonable steps to protect her PII. Plaintiff Reynolds has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Reynolds stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

131.     At the time of the Data Breach, FBCS retained Plaintiff Reynolds' PII in its systems, and on information and belief continues to retain that information.

132.     Plaintiff Reynolds first learned of the Data Breach after receiving a notification letter from FBCS on or about April 26, 2024, notifying her of the Data Breach and that her PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach, Plaintiff Reynolds made reasonable efforts to mitigate the impact thereof, including,

but not limited to, spending time monitoring her various financial and banking accounts, disputing unauthorized charges, changing her passwords, and utilizing credit monitoring services.

133. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Reynolds will need to maintain these heightened measures for years.

134. In the time following the Data Breach, Plaintiff Reynolds has experienced unauthorized fraudulent charges, attempts to open financial accounts in her name, inquiries on her credit, an exorbitant amount of spam calls, emails, and texts, and attempts to collect monies from her via PayPal.

135. Plaintiff Reynolds also suffered actual injury from having her PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Reynolds' confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff Reynolds' privacy rights as a result of Defendant's unauthorized disclosure of PII.

136. Plaintiff Reynolds has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed her PII to unauthorized parties who may now use that information for improper and unlawful purposes.

137. Plaintiff Reynolds has suffered, and will continue to suffer for the remainder of her life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from her PII being obtained by unauthorized third parties and/or cybercriminals.

138. Plaintiff Reynolds is also at a continued risk of harm because, on information and belief, her PII remains in Defendant's systems, which have already been shown to be susceptible

to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

139.    Plaintiff Reynolds has a continuing interest in ensuring that her PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

### *Plaintiff Dan Whatley*

140.    Plaintiff Dan Whatley is a resident and citizen of Longview, Texas. Plaintiff Whatley's PII was provided to or obtained by FBCS in connection with its provision of debt collection services to one of its clients or customers.

141.    Plaintiff Whatley currently does not have knowledge of how FBCS obtained his PII. Plaintiff Whatley does not recall receiving communications from FBCS regarding the collection of a debt, or otherwise communicating with FBCS. Plaintiff Whatley did not provide his PII to FBCS.

142.    Plaintiff Whatley is careful about sharing his PII and takes reasonable steps to protect his PII. Plaintiff Whatley has never knowingly transmitted unencrypted PII over the internet or other unsecured source. Plaintiff Whatley stores any documents containing PII in a safe and secure location and diligently chooses unique usernames and passwords for his online accounts.

143.    At the time of the Data Breach, FBCS retained Plaintiff Whatley's PII in its systems, and on information and belief continues to retain that information.

144.    Plaintiff Whatley first learned of the Data Breach after receiving a letter from FBCS on or about April 26, 2024, notifying him of the Data Breach and that his PII had been improperly accessed and acquired by unauthorized third parties. Upon receiving notice of the Data Breach,

Plaintiff Whatley made reasonable efforts to mitigate the impact thereof, including, but not limited to, spending time monitoring his various financial and banking accounts, disputing unauthorized charges, changing his passwords, and utilizing credit monitoring services.

145.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff Whatley will need to maintain these heightened measures for years.

146.    In the time following the Data Breach, Plaintiff Whatley has experienced unauthorized fraudulent charges, unauthorized access of his financial accounts, inquiries on his credit, an exorbitant amount of spam calls, emails, and texts.

147.    Plaintiff Whatley also suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff Whatley's confidential PII—a form of property that was entrusted (indirectly) to FBCS and was compromised as a result of the Data Breach FBCS failed to prevent, and (b) a violation of Plaintiff's privacy rights as a result of Defendant's unauthorized disclosure of PII.

148.    Plaintiff Whatley has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because FBCS disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

149.    Plaintiff Whatley has suffered, and will continue to suffer for the remainder of his life, imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

150.    Plaintiff Whatley is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible

to compromise and attack, and is subject to further attack so long as FBCS fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

151.    Plaintiff Whatley has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

**Defendant**

152.    Defendant Financial Business and Consumer Solutions, Inc. is a Pennsylvania corporation with its headquarters and principal place of business located at 330 S. Warminster Road, Suite 353, Hatboro, Pennsylvania 19040.

## JURISDICTION AND VENUE

153.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

154.    This Court has personal jurisdiction over FBCS because FBCS maintains its principal place of business in Pennsylvania and conducts substantial business in Pennsylvania and in this District through its principal place of business; engaged in the conduct at issue herein from and within this District; and otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

155.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because FBCS resides in this District, and this District is where a substantial part of the acts, omissions, and events giving rise to Plaintiffs' claims occurred.

## FACTUAL ALLEGATIONS

**I.     Overview of Financial Business and Consumer Solutions, Inc.**

156.    Founded in 1982, FBCS is a nationally licensed debt collection agency that provides accounts receivable management and collection services across a variety of industries. FBCS is headquartered in Hatboro, Pennsylvania, with additional satellite offices in Cape May, New Jersey and Tampa, Florida,[5] and boasts "more than 35 years of experience providing customer account management solutions for national creditors."[6]

157.    In the regular course of its business, FBCS collects and maintains highly sensitive PII of consumers, clients, and employees. As a regular and necessary part of its business, FBCS collects and maintains highly sensitive PII from its clients, which is used to collect debts on behalf of its clients. That information includes, but is not limited to, names, SSNs, dates of birth, and account information.[7] FBCS stores this information digitally.

158.    FBCS is and was aware of the sensitive nature of the PII it collects, and it acknowledges the importance of data privacy. In the Privacy Policy posted on its website, FBCS claims that it "takes your privacy and security very seriously and has put significant privacy and security protections in place for our consumers, clients, and employees. These protections are designed utilizing industry privacy and security best practices to ensure your personal information is protected."[8]

159.    In addition, the "Compliance & Technology" page on Defendant's website states:

---

[5] About the FBCS Team, https://www.fbcs-inc.com/about-fbcs-collection-agency/ (last visited Aug. 16, 2024).
[6] *See* FBCS, Inc., LINKEDIN, https://www.linkedin.com/company/fbcs-inc (last visited Aug. 16, 2024).
[7] Notice of Data Event, n. 2, *supra*.
[8] FBCS Privacy Policy, https://www.fbcs-inc.com/privacy-policy/ (last visited Aug. 16, 2024).

> The security of our clients' data is our top priority at Financial Business and Consumer Solutions (FBCS). Our facilities and systems exceed the requirements for SSAE 18 Type II, PCI-DSS, and ISO 27001 certifications and we participate in regular audits to validate our policies, procedures and systems.
>
> We operate on state of the art technology platforms that keep us compliant with information security requirements for large organizations and all state and federal regulations. Our advanced central administration system assists with the management of all our security policies and access privileges.
>
> The FBCS team is trained on security policies to keep our facilities and your data safe. We provide training to enhance our team's understanding of modern security risks, including social engineering attacks, phishing schemes, brute force attacks and more.[9]

160.   By obtaining, collecting, using, and benefitting from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties that required it to, at a minimum, implement adequate safeguards to prevent unauthorized use or disclosure of PII and to report any unauthorized use or disclosure of PII.

## II.   The Data Breach

161.   On or about February 26, 2024, FBCS "discovered unauthorized access to certain systems in its network" and subsequently "launched an investigation with the assistance of third-party computer forensics specialists to determine the full nature and scope of the incident."[10] Defendant's investigation revealed that its network "was subject to unauthorized access between February 14 and February 26, 2024, and the unauthorized actor had the ability to view or acquire certain information on the FBCS network during the period of access."[11]

---

[9] Compliance & Technology, https://www.fbcs-inc.com/compliance/ (last visited Aug. 16, 2024).
[10] Notice of Data Event, n. 2, *supra.*
[11] Pierluigi Paganini, *Financial Business and Consumer Solutions (FBCS) Data Breach Impacted 2M Individuals,* SECURITYAFFAIRS (Apr. 29, 2024),

162.    Despite learning of the Data Breach as early as February 26, 2024, FBCS did not announce the Data Breach publicly until April 26, 2024, and did not begin sending out breach notification letters to affected individuals until around that time.

163.    FBCS provided limited details about the Data Breach, including whether the cybercriminal(s) responsible for the Data Breach were identified or whether the information exfiltrated was held for ransom. FBCS also did not disclose whether its investigation detected the compromised information on the dark web. Instead, FBCS stated that it "immediately took steps to conduct a diligent investigation to confirm the nature and scope of the incident" and "implemented additional safeguards in a newly built environment." FBCS also offered access to credit monitoring and identity restoration services through CyEx at no charge to affected individuals.[12]

164.    The Notice letters that FBCS sent to Plaintiffs and Class Members state that the information that was accessed included: names, SSNs, dates of birth, and account information.[13]

165.    Defendant's Notice omits pertinent information including how criminals gained access to the encrypted files on its systems, what computer systems were impacted, the means and mechanisms of the cyberattack, the reason for the delay in notifying Plaintiffs and Class Members of the Data Breach, how it determined that the PII had been accessed, and of particular importance to Plaintiffs and Class Members, the actual steps FBCS took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

---

https://securityaffairs.com/162514/cyber-crime/fbcs-data-breach.html#:~:text=%E2%80%9CThe%20investigation%20determined%20that%20the, during%20the%20period%20of%20access.%E2%80%9D
[12] Notice of Data Event, n. 2, *supra*.
[13] *Id.*

166.     Based on Defendant's acknowledgment that an "unauthorized actor had the ability to view or acquire certain information on the FBCS network" during the Data Breach and that "certain information … may have been accessed or exfiltrated during the incident," it is evident that unauthorized criminal actors did in fact access Defendant's network and exfiltrate Plaintiffs' and Class Members' PII in an attack designed to acquire that sensitive, confidential, and valuable information.

167.     The PII contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired unintelligible data and would not have accessed Plaintiffs' and Class Members' PII.

168.     The Data Breach reportedly impacted the PII of approximately 4,253,394 individuals.[14]

### III.     FBCS Failed to Follow FTC Guidelines

169.     Defendant was prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.* ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

170.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

171.     According to the FTC, the need for data security should be factored into all business decision-making.

---

[14] *Id.*

172.     In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which established cybersecurity guidelines for businesses.

173.     The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

174.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

175.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

176.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

177.     Defendant failed to properly implement basic data security practices.

178.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

179.     Defendant was at all times fully aware of its obligation to protect Plaintiffs' and Class Members' PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**IV.     FBCS Failed to Comply with Industry Standards for Data Security**

180.     Experts on cybersecurity routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the PII that these entities collect and maintain.

181.     Several best practices have been identified that, at a minimum, should be implemented by corporate entities like Defendant, including, but not limited to: educating all employees; strong passwords; multi-layer security, such as firewalls and anti-virus and anti-malware software; encryption (e.g., making data unreadable without a key); multi-factor authentication; backup data; and limiting the number of employees with access to sensitive data.

182.     Other standard best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

183.     Defendant failed to meet the minimum standards of, e.g., the NIST Cybersecurity Framework, and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established industry standards in reasonable cybersecurity readiness.

184.     These foregoing frameworks are existing and applicable industry standards in the corporate sector and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

**V.     FBCS Owed Plaintiffs and Class Members a Duty to Safeguard Their PII**

185.     In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiffs and Class Members.

186.     Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including adequately training its employees and others who accessed PII within its computer systems on how to adequately protect PII.

187.     Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of PII in a timely manner.

188.     Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

189.     Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

190.     Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of inadequate data security practices.

## VI.    FBCS Knew That Criminals Target PII

191.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

192.    At all relevant times, Defendant knew, or should have known, that Plaintiffs' and Class Members' PII was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' PII from cyberattacks that Defendant should have anticipated and guarded against.

193.    The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII belonging to Defendant's consumers, clients, and employees, as well Plaintiffs and Class Members.

194.    PII is a valuable property right.[15] The value of PII as a commodity is measurable.[16] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[17] According to the IBM Cost of a Data Breach Report 2024, the global average cost

---

[15] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible..."), https://www.researchgate.net/publication/283668023_The_Value_of_ Personal_Data.
[16] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.
[17] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, No. 220 at 4, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

of a data breach in 2024 is $4.88 million, 10% more than in 2023 and the highest total ever.[18]

Personal data is so valuable to identity thieves that once PII has been disclosed, criminals often

trade it on the "cyber black-market," or the "dark web," for many years.

195.    As a result of its real value and the recent large-scale data breaches, identity thieves

and cybercriminals have openly posted credit card numbers, SSNs, and other sensitive information

directly on various websites, making the information publicly available. This information from

various breaches, including the information exposed in the Data Breach, can be aggregated and

become more valuable to thieves and more damaging to victims.

196.    PII can be sold at a price ranging from $40 to $200, and bank details have a price

range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to

$110 on the dark web.[20] All-inclusive dossiers containing sensitive health insurance information,

names, addresses, telephone numbers, email addresses, SSNs, and bank account information,

complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black

market.[21] Criminals can also purchase access to entire company data breaches from $900 to

$4,500.[22]

---

[18] IBM, *Cost of a Data Breach Report 2024*, available at https://www.ibm.com/reports/data-breach.

[19] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[20] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[21] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[22] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Aug. 16, 2024).

197.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

198.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

199.    Indeed, cyberattacks have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[24]

200.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[25]

---

[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.
[24] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.
[25] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

201.     The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[26]

## VII.     Theft of PII Has Grave and Lasting Consequences for Breach Victims

202.     Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[27]

203.     Identity thieves use PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[28] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number

---

[26] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Department of Health and Human Services (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[27] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER ADVICE, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft.

[28] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

to withdraw funds, obtain a new driver's license or other form of identification, and/or use the victim's information in the event of arrest or court action.[29]

204.    With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[30]

205.    Each year, identity theft causes billions of dollars of losses to victims in the United States. For example, with the PII stolen in the Data Breach, which includes SSNs, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

206.    The PII exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and

---

[29] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[30] *See Warning Signs of Identity Theft*, Federal Trade Commission, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Aug. 16, 2024).

substantial. As the FTC has reported, if cyberthieves get access to a person's highly sensitive information, they will use it.[31]

207.    For instance, with a stolen SSN, which is only one subset of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[32]

208.    Sensitive data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[33]

209.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[34]

210.    Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of a SSNs, and a new number will not be provided until after the victim has suffered the harm.

---

[31] Ari Lazarus, *How fast will identity thieves use stolen info?*, FEDERAL TRADE COMMISSION BLOG (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

[32] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* CREDIT.COM (Nov. 15, 2017), https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/.

[33] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* COMPUTER WORLD (Feb. 6, 2015), https://www.redseal.net/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers/.

[34] Identity Theft Resource Center, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/.

211.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[35]

212.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her SSN was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

213.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and criminals can exploit that information for years to come after that.[36]

214.    It is within this context that Plaintiffs and Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

---

[35] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[36] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

215.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:



216.    Victims of the Data Breach, like Plaintiffs and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[37]

217.    As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and Class Members must now spend the time and expend the effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their

---

[37] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION, 4 (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other account information for unauthorized activity for years to come.

218.   Plaintiffs and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including, but not limited to the following:

a.   Trespass, damage to, and theft of their personal property, including PII;

b.   Improper disclosure of their PII;

c.   The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their PII being in the hands of criminals and having already been misused;

d.   The imminent and certainly impending risk of having their confidential PII used against them by spam callers to defraud them;

e.   Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

f.   Loss of privacy suffered as a result of the Data Breach;

g.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h.   Ascertainable losses in the form of deprivation of the value of Plaintiffs' and Class Members' PII for which there is a well-established and quantifiable national and international market;

i.   The loss of use of and access to their credit, accounts, and/or funds;

j.   Damage to their credit due to fraudulent use of their PII; and

k.      Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

219.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which remains in the possession of Defendant, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Defendant has shown to be incapable of protecting Plaintiffs' and Class Members' PII.

**VIII.   Stolen PII Is Sold and Published on the Dark Web**

220.    Because of the huge profits that can be obtained by defrauding individuals with stolen PII, this information is a valuable commodity to cybercriminals, and it is therefore regularly bought and sold in online markets on the dark web.

221.    Unlike the "surface web"—publicly accessible websites—or even the "deep web"—private resources like email or file storage servers—the dark web is the part of the internet that is almost entirely hidden, not accessible via regular internet browsers or website addresses. Though the dark web is accessed over the Internet, it is entirely encrypted, unsearchable, and private, with only specific sites' users, many of whom are cybercriminals, knowing the precise addresses used to access those sites and forums.

222.    Most dark web sites are accessed through a network called The Onion Router ("TOR"). The TOR browser is a free, open-source web browser, which allows users to visit sites without leaving any traces of their identities or locations behind. Traffic on TOR is routed through a series of proxy servers that continually re-encrypt the requests and responses, rendering the identities of the users and the sources of content nearly impossible to trace.

223.    The dark web is inaccessible by the average person with a standard internet browser. Surface websites end in common primary domain extensions like ".com", ".net", and ".gov" and have short domain names often with memorable words. In contrast, sites on the dark web end in ".onion", ".i2p", and ".eth" and are made up of long strings of random numbers and letters, making them impossible to find or guess without prior knowledge of their existence. Dark web websites are also notorious for frequently changing servers, disappearing and reappearing randomly, and altering their dark web domain names.

224.    The dark web poses significant challenges to cybersecurity professionals and law enforcement agencies. The dark web is legal to access and operate, and it has some legitimate applications and sites. But its hidden nature and employment of multi-level encryption make detecting and monitoring illegal activity difficult. Unlike the surface internet, dark web websites do not advertise their existence.

225.    The dark web has become infamous as a marketplace for illegal products and services, including drugs, weapons, human trafficking, and stolen data (among others). Cybercriminals take advantage of the technologically enabled anonymity to trade, sell, and share information with limited fear that they will be uncovered by law enforcement.

226.    Although anyone can install the TOR browser, accessing the dark web requires prior knowledge of the existence of sites, how to gain access to the sites, and the community of criminals that operate them. Infiltrating the dark web therefore requires a significant investment of time, technical skill, and specialized law enforcement techniques, such as undercover operations and the use of confidential informants.

227.    Stolen data is often found on publicly known dark web sites, which is itself a major risk of identity theft for the owners of the data. But an additional and greater risk is when stolen

data exists on the dark web on sites and within the criminal networks that are not publicly known. Though there is some public knowledge of the sharing of stolen data on the dark web, there are vast areas of the dark web that are not known to law enforcement and researchers. It is therefore plausible—if not certain—that stolen data is bought and sold on the dark web without any public knowledge of it happening.

### IX.    The Data Breach Was Foreseeable and Preventable

228.    Data disclosures and data breaches are preventable.[38] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[39] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[40]

229.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[41]

230.    As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[42]

---

[38] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).
[39] *Id.* at 17.
[40] *Id.* at 28.
[41] *Id.*
[42] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI.GOV, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 16, 2024).

231.    Plaintiffs and Class Members expected that anyone in Defendant's position, i.e., anyone entrusted with their PII, would safeguard their PII against cyberattacks, delete or destroy PII that Defendant was no longer required to maintain, and timely and accurately notify them if their PII was compromised.

## X.    Damages Sustained by Plaintiffs and Class Members

232.    To date, Defendant has done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach. FBCS only offered single bureau "credit monitoring and identity restoration services … through CyEx,"[43] but did not disclose how it determined eligibility. Not only did Defendant fail to provide adequate ongoing credit monitoring or identity protection services for individuals impacted by the Data Breach, but the credit monitoring identity theft protection services do nothing to compensate Plaintiffs and Class Members for damages incurred, and time spent dealing with, the Data Breach.

233.    Plaintiffs and Class Members have been damaged by the compromise and disclosure of their PII in the Data Breach.

234.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

235.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII, as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

---

[43] Notice of Data Event, n. 2, *supra*.

236.    Plaintiffs and Class Members have and will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

237.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.      Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.      Purchasing credit monitoring and identity theft prevention;

c.      Placing "freezes" and "alerts" with reporting agencies;

d.      Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their names;

e.      Contacting financial institutions and closing or modifying financial accounts; and

f.      Closely reviewing and monitoring SSNs, insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

238.    Plaintiffs and Class Members suffered actual injury from having their PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of their PII, a form of property that FBCS obtained from Plaintiffs and

Class Members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

239.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

240.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and are at a present and imminent and increased risk of future harm.

241.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing PII is not accessible online, is properly encrypted, and that access to such data is password protected.

242.    Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendant's failure to incur the costs necessary to implement adequate and reasonable cybersecurity training, procedures, and protocols that were necessary to protect Plaintiffs' and Class Members' PII.

243.    Defendant maintained the PII in an objectively reckless manner, making the PII vulnerable to unauthorized disclosure.

244.    Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would result if Plaintiffs' and Class Members' PII was stolen, including the significant costs that would be placed on Plaintiffs and Class Members as a result of the breach. Instead, Defendant de-prioritized data security and

privacy, and pushed off the costs associated with ensuring Plaintiffs' and Class Members' privacy until after the worst case scenario occurred.

245.    The risk of improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendant, and Defendant was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' PII from that risk left the PII in a dangerous condition.

246.    Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their PII was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members with prompt and accurate notice of the Data Breach.

## **CLASS ALLEGATIONS**

247.    Plaintiffs bring this class action individually and on behalf of all members of the following classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23:

**Nationwide Class**

All persons in the United States whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**California Class**

All persons in California whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>Georgia Class</u>**

All persons in Georgia whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>Illinois Class</u>**

All persons in Illinois whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>Massachusetts Class</u>**

All persons in Massachusetts whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>New Jersey Class</u>**

All persons in New Jersey whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>New York Class</u>**

All persons in New York whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>Ohio Class</u>**

All persons in Ohio whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**<u>Pennsylvania Class</u>**

All persons in Pennsylvania whose PII was compromised in the Data Breach disclosed by FBCS, including all persons who were sent notice of the Data Breach.

**Texas Class**

> All persons in Texas whose PII was compromised in the Data
> Breach disclosed by FBCS, including all persons who were sent
> notice of the Data Breach.

248.     The nationwide class and the state classes are collectively referred to as the "Class."

Excluded from the Class are FBCS and its affiliates, parents, subsidiaries, officers, agents, and

directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

249.     <u>Numerosity:</u> The members in the Class are so numerous that joinder of all Class

Members in a single proceeding would be impracticable. As noted above, over 4 million

individuals' PII was exposed in the Data Breach. The Class is ascertainable by resort to

Defendant's business records, and Defendant has already provided notice of the Data Breach to

impacted individuals by resort to its own records.

250.     <u>Commonality and Predominance:</u> Certification of Plaintiffs' claims for class-wide

treatment is appropriate because Plaintiffs can prove the elements of Plaintiffs' claims on a class-

wide basis using the same common evidence as would be used to prove those elements in

individual actions alleging the same claims. Common questions of law and fact exist as to all Class

Members and predominate over any potential questions affecting only individual Class Members.

Such common questions of law or fact include, *inter alia*:

> a.      Whether FBCS had a duty to implement and maintain reasonable security
>
>         procedures and practices to protect and secure Plaintiffs' and Class
>
>         Members' PII from unauthorized access and disclosure;
>
> b.      Whether the computer systems and data security practices employed by
>
>         FBCS to protect Plaintiffs' and Class Members' PII violated the FTC Act,
>
>         and/or state laws and/or Defendant's other duties discussed herein;

c. Whether FBCS failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

d. Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

e. Whether FBCS failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' PII;

f. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and Class Members;

g. Whether Defendant's actions and inactions alleged herein constitute gross negligence;

h. Whether FBCS breached its duties to protect Plaintiffs' and Class Members' PII; and

i. Whether Plaintiffs and Class Members are entitled to damages and the measure of such damages and relief.

251. FBCS engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that predominate in this action.

252. Typicality: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had PII compromised in the Data Breach. Plaintiffs and Class

Members were injured by the same wrongful acts, practices, and omissions committed by FBCS, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

253.    <u>Adequacy:</u> Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Class and have no interests adverse to, or in conflict with, the Class that Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

254.    <u>Superiority:</u> A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FBCS, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

255.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. Otherwise, FBCS would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the

limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

256.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

257.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

258.    Unless a class-wide injunction is issued, FBCS may continue in its failure to properly secure Class Members' PII, to refuse to provide proper notification to Class Members regarding the Data Breach, and to act unlawfully as set forth in this complaint.

259.    Further, FBCS has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE PER SE
**(On behalf of Plaintiffs and the Nationwide Class or, Alternatively, the State Classes)**

260.    Plaintiffs restate and reallege paragraphs 1-259 as if fully set forth herein.

261.    This claim is brought by Plaintiffs on behalf of the Nationwide Class or, alternatively, on behalf of the State Classes under the laws of Plaintiffs' respective home states.

262.    Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

263.    Defendant knew or should have known of the risks inherent in collecting the PII of Plaintiffs and Class Members and the importance of adequate security. Defendant was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

264.    Defendant owed a duty of care to Plaintiffs and Class Members whose PII was entrusted to it. Defendant's duties included, but were not limited to, the following:

    a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in its possession;

    b.  To protect Plaintiffs' and Class Members' PII using reasonable and adequate security procedures and systems compliant with industry standards;

    c.  To have procedures in place to prevent the loss or unauthorized dissemination of PII in its possession;

    d.  To employ reasonable security measures and otherwise protect the PII of Plaintiffs and Class Members pursuant to the FTC Act;

    e.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

265. Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

266. Defendant's duty also arose because Defendant was bound by industry standards to protect its customers' confidential PII.

267. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendant owed them a duty of care to not subject them to an unreasonable risk of harm.

268. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' PII within Defendant's possession.

269. Defendant, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiffs and Class Members.

270. Defendant, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failed to provide prompt notice of the Data Breach to the persons whose PII was compromised.

271. Defendant breached its duties, and thus was negligent and negligent per se, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific

negligent acts and omissions committed by Defendant include, but are not limited to, the following:

  a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII;

  b.  Failing to adequately monitor the security of its networks and systems;

  c.  Failing to periodically ensure that its email system maintained reasonable data security safeguards;

  d.  Allowing unauthorized access to Plaintiffs' and Class Members' PII; and

  e.  Failing to comply with the FTC Act;

272.  Defendant acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the PII compromised in the Data Breach.

273.  Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' PII to be compromised, exfiltrated, and misused, as alleged herein.

274.  As a result of Defendant's ongoing failure to notify Plaintiffs and Class Members regarding exactly what PII has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

275.  Defendant's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their PII, and/or loss of time and money to monitor their accounts for fraud.

276.  As a result of Defendant's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their PII,

which, upon information and belief, is still in the possession of FBCS, will be used for fraudulent purposes.

277.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

278.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

279.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

280.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

<u>COUNT II</u>
**THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the State Classes)**

281.    Plaintiffs restate and reallege paragraphs 1-259 as if fully set forth herein.

282.    This claim is brought by Plaintiffs on behalf of the Nationwide Class or, alternatively, on behalf of the State Classes under the laws of Plaintiffs' respective home states.

283.    Defendant entered into contracts with its various clients, who are Plaintiffs' and Class Members' creditors, to provide debt collection services to those clients.

284.    Those contracts were virtually identical to each other and were made expressly for the benefit of Plaintiffs and Class Members, as, among other terms, it was contemplated by both parties, that Defendant would obtain and protect Plaintiffs' and Class Members' PII. Thus, the

collection and protection of the PII belonging to Plaintiffs and Class Members was one of the objectives of the contracting parties.

285.    Defendant knew that if it were to breach the contracts with its clients, the clients' customers, including Plaintiffs and Class Members, would be harmed by, among other things, fraudulent misuse of their PII.

286.    Defendant breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach, resulting in the compromise of Plaintiffs' and Class Members' PII.

287.    Plaintiffs and Class Members were harmed as a result of Defendant's failure to abide by the obligations agreed to in its contracts with its clients, and to use reasonable data security measures to store their PII. This harm, as outlined above, was a reasonably foreseeable consequence of the breach.

288.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

289.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the State Classes)**

290.    Plaintiffs restate and reallege paragraphs 1-259 as if fully set forth herein.

291.    This count is pleaded in the alternative to Plaintiffs' breach of third-party beneficiary contract claim (Count II).

292.   This claim is brought by Plaintiffs on behalf of the Nationwide Class or, alternatively, on behalf of the State Classes under the laws of Plaintiffs' respective home states.

293.   Plaintiffs and Class Members conferred a monetary benefit on FBCS by providing it, indirectly, with their valuable PII.

294.   FBCS knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to it. FBCS profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

295.   FBCS failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

296.   FBCS acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

297.   If Plaintiffs and Class Members had known FBCS would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would never have agreed to the entrustment of their PII to FBCS.

298.   Under the circumstances, it would be unjust for FBCS to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

299.   As a direct an proximate result of FBCS' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in FBCS'

possession and is subject to further unauthorized disclosures so long as FBCS fails to undertake appropriate and adequate measures to protect the PII.

300.     Plaintiffs and Class Members are entitled to restitution and/or damages from FBCS and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by FBCS from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

301.     Plaintiffs and Class Members may not have an adequate remedy at law against FBCS and, accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

302.     Plaintiffs restate and reallege paragraphs 1-259 as if fully set forth herein.

303.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

304.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

305.     An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class Members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from future data breaches that

compromise their PII. Plaintiffs and the Class remain at imminent risk that additional compromises of their PII will occur in the future.

306.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

307.    On information and belief, Defendant still possesses Plaintiffs' and Class Members' PII.

308.    Defendant has made no announcement that it has changed its data storage or security practices relating to the storage of Plaintiffs' and Class Members' PII, or that it deleted Plaintiffs' and Class Members' PII.

309.    To Plaintiffs' knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

310.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at FBCS. The risk of another such breach is real, immediate, and substantial.

311.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at FBCS, Plaintiffs and Class Members will likely continue to be subjected to a heightened, substantial, imminent risk of fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

312.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at FBCS, thus eliminating the additional injuries that would result to Plaintiffs and Class Members, along with other consumers whose PII would be further compromised.

313.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that FBCS implement and maintain reasonable security measures, including, but not limited to, the following:

   a.   Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering FBCS to promptly correct any problems or issues detected by such third-party security auditors;

   b.   Engaging third-party security auditors and internal personnel to run automated security monitoring;

   c.   Auditing, testing, and training its security personnel regarding any new or modified procedures;

   d.   Purging, deleting, and destroying PII not necessary for its provisions of services in a reasonably secure manner;

   e.   Conducting regular database scans and security checks; and

   f.   Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

<u>COUNT V</u>
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")**
**(On Behalf Plaintiffs Haseltine, Flores, Wallace, and the California Class)**

314.    Plaintiffs David Robert Haseltine, Natalie Castellanos Flores, and Daniel Wallace ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Class, restate paragraphs 1-259 as if fully set forth herein.

315.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

316.    Defendant violated UCL by engaging in unlawful, unfair, and deceptive business acts and practices.

317.    Defendant's "unfair" acts and practices include Defendant's failure to implement and maintain reasonable security measures to protect Plaintiffs' and the California Class Members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach.

318.    Defendant's failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition.

319.    Defendant engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82. Specifically, Defendant has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification); California Consumer Privacy Act, the FTC Act, and California common law.

320.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and the California Class Members were injured and suffered monetary and non-monetary damages, as described herein, including, but not limited to, fraud and identity

theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

321.    Defendant acted intentionally, knowingly, and maliciously to violate California's UCL, and recklessly disregarded Plaintiffs' and the California Class Members' rights.

322.    Plaintiffs and the California Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code §§ 1798.100** *et seq.* **(2023) ("CCPA")**
**(On Behalf Plaintiffs Haseltine, Flores, Wallace, and the California Class)**

323.    Plaintiffs David Robert Haseltine, Natalie Castellanos Flores, and Daniel Wallace ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Class, restate and reallege paragraphs 1-259 as if fully set forth herein.

324.    Plaintiffs and the California Class Members are consumers and California residents as defined by Cal. Civ. Code section 1798.140(g).

325.    Defendant is a "business" as defined by Cal. Civ. Code § 1798.140(c)(1) because it is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners that collects consumers' personal information or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California

. . . [and] [h]as annual gross revenues in excess of twenty-five million dollars ($25,000,000) . . . [and] alone or in combination, annually buys, receives for the business's commercial purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices."

326.     The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent.

327.     Section 1798.150(a)(1) of the CCPA provides, "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined by [Cal. Civ. Code section 1798.81.5(d)(1)(A)] . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

328.     Plaintiffs' and California Class Members' personal information, as defined by Civil Code Section 1798.140(o), was subject to unauthorized access and exfiltration, theft, or disclosure.

329.     Defendant knew, or should have known, that its network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely.

330.     Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect PII by:

        a.     Failing to implement and maintain appropriate and reasonable security procedures and practices to safeguard and protect the PII of California Class Members from unauthorized access and disclosure;

b. Failing to encrypt the PII of Plaintiffs and California Class Members;

c. Failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

d. Storing Plaintiffs' and California Class Members' PII in an internet-accessible environment when such storage was unnecessary;

e. Continuing to accept and store PII after it knew or should have known about the Data Breach; and

f. unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Class Members from taking timely self-protection measures.

331. Through the conduct complained of herein, Defendant violated the CCPA by subjecting Plaintiffs' and California class members' PII to unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violation of its duties to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

332. In accordance with Cal. Civ. Code §1798.150(b), Plaintiffs' counsel served Defendant with notice of these CCPA violations on behalf of Plaintiffs Haseltine (on August 14, 2024), Flores (on August 9, 2024), and Wallace (on May 28, 2024), all prior to filing this Consolidated Complaint.

333. Accordingly, Plaintiffs Haseltine and Flores currently seek only injunctive relief in the form of an order enjoining Defendant from continuing to violate the CCPA.

334. If Defendant fails to agree to rectify the violations detailed above, individually and on behalf of California Class Members, Plaintiffs Haseltine and Flores will seek actual, punitive,

and statutory damages, restitution, and any other relief the Court deems proper as a result of Defendant's CCPA violations.

335.    In response to Plaintiff Wallace's May 28, 2024 pre-suit demand letter, FBCS declined to rectify the identified CCPA violations. Accordingly, Plaintiff Wallace, on behalf of himself and the California Class Members, seeks all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing Class Members' PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

336.    Plaintiff Wallace, individually and on behalf of the California Class, is further entitled to, and therefore demands, statutory damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident, or actual damages, whichever is greater. *See* Cal. Civ. Code § 1798.150(b).

**<u>COUNT VII</u>**
**VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT**
**Cal. Civ. Code §§ 1798.80 *et seq.***
**(On Behalf Plaintiffs Haseltine, Flores, Wallace, and the California Class)**

337.    Plaintiffs David Robert Haseltine, Natalie Castellanos Flores, and Daniel Wallace ("Plaintiffs," for purposes of this Count), individually and on behalf of the California Class, restate and reallege paragraphs 1-259 as if fully set forth herein.

338.    "[T]o ensure that PII about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains PII about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the PII from unauthorized access, destruction, use, modification, or disclosure."

339.     Defendant is a business that owns, maintains, and licenses PII, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiffs and California Class Members.

340.     Further, businesses that own or license "computerized data" that includes PII are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of PII that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

341.     Defendant is a business that owns or licenses computerized data that includes PII as defined by Cal. Civ. Code § 1798.82.

342.     Plaintiffs' and California Class Members' PII includes PII as covered by Cal. Civ. Code § 1798.82.

343.     Defendant maintained Plaintiffs' and California Class Members' PII in a reckless manner, as described in this Complaint.

344.     Because Defendant reasonably believed that Plaintiffs' and California Class Members' PII was acquired by unauthorized persons during the Data Breach, Defendant had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

345.     By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Cal. Civ. Code § 1798.82.

346.     As a direct and proximate result of Defendant's violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and California Class Members suffered damages, as described above.

347.    Plaintiffs and California Class Members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

**COUNT VIII**
**VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT**
**O.C.G.A. §10-1-390,** *et seq.* **("FBPA")**
**(On Behalf Plaintiff Ellison and the Georgia Class)**

348.    Plaintiff Jeffrey Ellison ("Plaintiff," for purposes of this Count), individually and on behalf of the Georgia Class, restates and realleges paragraphs 1-259 as if fully set forth herein.

349.    The FBPA provides (§10-1-393(a)): "Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful."

350.    Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce. Mainly, Defendant obtained the PII of Plaintiff and the Georgia Class through trade or commerce directly or indirectly affecting Plaintiff and the Georgia Class and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

351.    As alleged herein this Complaint, Defendant engaged in unfair, deceptive acts or unconscionable practices in the conduct of consumer transactions, including, among other things, the following:

    a.   failure to implement adequate data security practices to safeguard PII; and

    b.   failure to make only authorized disclosures of Plaintiff and Georgia Class Members.

352.    Defendant's actions constitute deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to Plaintiff and Georgia Class Members.

353.    In committing the acts alleged above, Defendant engaged in deceptive, and unfair acts and practices by failing to follow industry best practices for the collection, use, and storage of PII.

354.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Georgia Class have been harmed and have suffered damages, including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

355.    As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff and the Georgia Class have been damaged and are entitled to recover actual damages, an order providing declaratory and injunctive relief, and reasonable attorneys' fees and costs, to the extent permitted by law.

356.    Also, as a direct result of Defendant's knowing violation of the Georgia FBPA, Plaintiff and the Georgia Class are entitled to damages as well as injunctive relief, including, but not limited to:

a.  Ordering Defendant to engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering Defendant to engage third-party security auditors and internal personnel to run automated security monitoring;

c.   Ordering Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

d.   Ordering Defendant to segment PII by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.   Ordering Defendant to purge, delete, and destroy in a reasonably secure manner PII not necessary for their provisions of services;

f.   Ordering Defendant to conduct regular database scanning and security checks;

g.   Ordering Defendant to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

h.   Ordering Defendant to meaningfully educate Plaintiff and Georgia Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps Plaintiff and Georgia Class Members must take to protect themselves; and

i.   Requiring Defendant to thoroughly and regularly evaluate any vendor's or third party's technology that allows or could allow access to PII and to promptly migrate to a superior or more secure alternative.

## <u>COUNT IX</u>
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1, *et seq*. ("ICFA")
### (On Behalf Plaintiff Krauser and the Illinois Class)

357.   Plaintiff Daniel Krauser ("Plaintiff," for purposes of this Count), individually and on behalf of the Illinois Class, restates and realleges paragraphs 1-259 as if fully set forth herein.

358. Section 2 of ICFA prohibits unfair or deceptive acts or practices and states, in relevant part, as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

359. Defendant violated Section 2 of ICFA by engaging in unfair acts in the course of conduct involving trade or commerce when dealing with Plaintiff.

360. Specifically, it was an unfair act and practice to fail to take commercially reasonable steps to prevent the Data Breach, and fail to timely detect the Data Breach.

361. Plaintiff and the Illinois Class Members have suffered injury in fact and actual damages, as alleged herein, as a result of Defendant's unlawful conduct and violations of the ICFA and analogous state statutes.

362. Defendant's conduct offends public policy as it demonstrates a practice of unfair and deceptive business practices in failing to safeguard consumers PII.

363. An award of punitive damages is appropriate because Defendant's conduct described above was outrageous, willful and wanton, showed a reckless disregard for the rights of the Plaintiff and consumers, generally, and Plaintiff had no choice but to submit to Defendant's illegal conduct.

//

//

//

//

## COUNT X
**VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES ACT**
**N.Y. Gen. Bus. Law § 349 ("GBL")**
**(On Behalf Plaintiff Morrow, Sr. and the New York Class)**

364.    Plaintiff Ronnie Morrow, Sr. ("Plaintiff," for purposes of this Count), individually and on behalf of the New York Class, restates and realleges paragraphs 1-259 as if fully set forth herein.

365.    Plaintiff Morrow and New York Class Members are "persons" within the meaning of GBL § 349(h).

366.    Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of GBL § 349(b).

367.    Under GBL Section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

368.    Defendant violated the GBL through its failure to adequately safeguard and maintain Plaintiff's and New York Class Members' PII, despite using that information to profit from its business. Defendant's conduct is unfair because it gains financial advantage and profits from the receipt, storage, and utilization of Plaintiff's and New York Class Members' sensitive PII, yet Defendant fails to take the necessary steps, including expending the necessary resources, to protect that information.

369.    Defendant also failed to notify Plaintiff Morrow and other New York Class Members against whom Defendant is collecting debts or whose PII Defendant is collecting, storing, and utilizing, that, contrary to its representations about valuing data security and privacy, it does not maintain adequate controls to protect PII. It omitted and failed to disclose all this information from Plaintiff Morrow and New York Class Members.

370.     As a result of Defendant's conduct, Plaintiff Morrow and the New York Class have suffered damages from the disclosure of their information to unauthorized individuals.

371.     The injury and harm that Plaintiff Morrow and the other New York Class Members suffered was the direct and proximate result of Defendant's violations of the GBL. Plaintiff and New York Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII, which remains in Defendant's possession; (vi) and future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

372.     Plaintiff Morrow, individually and on behalf of the New York Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair and deceptive practices.

373.     Under the GBL, Plaintiff Morrow and New York Class Members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendant acted willfully or knowingly, Plaintiff Morrow and New York Class Members are entitled to recover three times their actual damages. Plaintiff Morrow is also entitled to reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against FBCS as follows:

a.  Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b.  Awarding Plaintiffs and Class Members appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

c.  Awarding Plaintiffs and Class Members equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, individually and on behalf of all other members of the Class, seek appropriate injunctive relief designed to prevent FBCS from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft.

d.  Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

e.  Awarding Plaintiffs and Class Members reasonable attorneys' fees, costs, and expenses, as allowable; and

f.  Awarding Plaintiffs and Class Members such other favorable relief as allowable under law.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  August 16, 2024                    Respectfully submitted,


By:     _/s/ Andrew Ferich_____
        **AHDOOT & WOLFSON, PC**
        Andrew W. Ferich (PA I.D. 313696)

201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel.: 310)-474-9111
Fax: 310-474-8585
aferich@ahdootwolfson.com

Jeff Ostrow (admitted *pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: 954-525-4100
ostrow@kolawyers.com

Charles E. Schaffer (PA I.D. 76259)
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
cschaffer@lfsblaw.com

John A. Yanchunis (admitted *pro hac vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street 7th Floor
Tampa, FL 33602
Tel: 813-223-5505
JYanchunis@forthepeople.com

*Interim Co-Lead Counsel*

Mariya Weekes (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2ND Floor
Coral Gables, FL 33134
Tel: 786-879-8200
mweekes@milberg.com

*Interim Chair of Plaintiffs' Executive Committee*

Samantha E. Holbrook (PA ID 311829)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Tel: (610) 477-8380

sholbrook@shublawyers.com

*Plaintiffs' Interim Liaison Counsel and Executive Committee Member*

Jennifer M. French*
**LYNCH CARPENTER, LLP**
1234 Camino Del Mar
Del Mar, CA 92014
T:(619) 762-1910
jennf@lcllp.com

Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
74 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
tbean@sirillp.com

Bart D. Cohen (PA Bar No. 57606)
**BAILEY GLASSER LLP**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 274-9420
bcohen@baileyglasser.com

Katherine M. Aizpuru (admitted *pro hac vice*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave. NW - Suite 1010
Washington, D.C. 20006
T: (202) 973-0900
F: (202) 973-0900
kaizpuru@tzlegal.com

*Plaintiffs' Interim Executive Committee*

\**pro hac vice* pending or to be filed